Good morning everyone and welcome. I'd like to explain to you that although Judge Brennan is not with us physically this morning, he has read all of the briefs. He will be listening to the arguments, watching the video, and will take part in our conference. So although you may see only two judges, in actuality you have three. And I will welcome you, as does Judge Eve, as does Judge Brennan in absentia. And I will call the first case, which is appeal number 21-2475. And it's John Kluge versus the Brownsburg Community School. So there you are, Mr. Gray. Yes, Your Honor. If you'd like to begin. I know you have five minutes saved for rebuttal. Thank you, Your Honor. Well, we'll all watch the clock. Thank you very much. Good morning. My name is Rory Gray and I represent John Kluge, the plaintiff appellant, in this matter. May it please the court. Here, the school district agrees that Mr. Kluge made out a prima facie case of religious discrimination. And that's important because it shifts the burden from Mr. Kluge to the school district agreed to, and that was in place for a year, caused undue hardship. But the record here shows that the district was really just trying to enforce orthodoxy. It had no legitimate basis for forcing Mr. Kluge to speak out in a way that violates his faith, rather than remaining silent and neutral on a controversial topic like transgenderism. There is no undue hardship here. Mr. Kluge was an excellent teacher who treated all of his students the same. He went out of his way and did everything that he could to respect his transgender students, including changing the way that he taught every student in every class. Mr. Kluge, may I interrupt you, please? When Mr. Kluge was told that his last name's practice was creating tension in students and faculty, and that transgender students felt dehumanized, Mr. Kluge reported feeling encouraged by this news and believed his practice was being effective. What did he mean by being effective? Is there any way that we could read that, other than he believed his religious message was being conveyed and having the effect that he wanted of alerting students and teachers of his religious disapproval of transgender people? Your Honor, I don't think that you could read it that way, because Mr. Kluge explained that he was trying to remain neutral, and when he was encouraged by what was happening, that neutrality was coming across, and that's what he was speaking about in terms of remaining neutral and not taking a position, because that's what the school district has a problem with here. It's never that anything Mr. Kluge actually said was wrong. He used students' last names, which, after all, are their real correct names. He did it in every class for every student, regardless of whether there was a transgender student present, and we know from our society that using last names is not considered negative or impolite. It happens, for instance, all the time in sports, in law and in the military. So, what we have here, Your Honor, is not a case in which a teacher is reaching out and misgendering a student or harassing a student. Mr. Kluge did everything that he could, in fact, not to communicate his beliefs to his students. He certainly wasn't trying to convince them of his views, and he never criticized their beliefs or their way of life. He was trying to remain neutral and silent in order to remain consistent with his beliefs. Mr. Gray, you said that the school said he wasn't doing anything wrong, but he was going against the policy of calling students by their preferred names and names that had been input into the power school pursuant to the policy. The school has submitted evidence, in particular, to students, and then some additional evidence from teachers, that the transgender students were feeling dehumanized, and it was having a negative emotional impact on them. That's the problem that the school is arguing, is creating the I did not see anything in the record below that you have contested what these students are saying about the emotional impact on them. I know you've contested some other things, but the affidavits from Sam and Aiden and the statements they made below, I haven't seen you contesting that fact of the impact on them. So, why doesn't that qualify for the undue hardship on the school? Well, Your Honor, under cases like Abercrombie, we need to look at the school district's motives. Abercrombie deals with a different element. Abercrombie does not deal with undue hardship. It didn't address undue hardship. It addressed the second element about calling the religious practice to the employer's attention. It was not an undue hardship case, so I think you have to look elsewhere. Well, I think, Your Honor, in Title VII, it's always the employer's motives that matter. An employer can do any number of things, but they can't do it for specific reasons. And so, we need to look at what the district's reasons were at the time it withdrew the accommodation. And if you do that, the district's evidence is of students grumbling or complaining at Equality Alliance meetings. There are a few parental complaints that the district never took seriously and which had no real basis. So, is it your argument that the students who were telling the school and telling the teachers that the last name practice was degrading and had a negative emotional impact on them, that that's what the grumbling is? Well, Your Honor, the affidavits that you're talking about were never introduced by the school district. Those affidavits were made by an advocacy group who was trying to intervene in Mr. Kluge's case. But putting aside the affidavits, there's plenty of evidence in the record from what was conveyed to Mr. Lee and what the authorities at the school knew about the impact on some of the transgender students. And I don't see you contesting that evidence. Well, Your Honor, it's very akin to contesting a religious belief. What somebody finds subjectively offensive, the question here is whether that subjective offense is legally significant. And when you're talking about a teacher like Mr. Kluge, who is not trying to proselytize, he's not harassing anyone, he's not reaching out to say anything offensive, he's just trying to conform his own speech to his religious beliefs. And that's the sort of employment accommodation that Title VII should give. And it's the sort of employee that a school district should want to keep. You see, Mr. Kluge maintains that he didn't discriminate because he treated all of his students the same way. And that he, you know, he explained his practice in non-religious terms. But teenagers are so smart. And they, the students discerned his true intentions immediately and accurately. I'm wondering why we shouldn't analyze this practice as if the students knew his practice was motivated by his refusal to acknowledge their transgender identities. Why should we treat it as a neutral when the true biased nature of the practice was apparent to everyone? Well, Your Honor, the record doesn't support that because Mr. Kluge the previous year had used students' last names. That's in his declaration. It's also supported by the declaration of Ms. Yang. And so there was really no significant difference between the accommodation and what he'd done before. And we need to remember that this is an orchestra. The complaints were coming in. There were the complaints, not only from, you know, the transgender children, but parents, other students, teachers. Your Honor, the Sixth and Ninth Circuits. It was all out there. Yes, Your Honor, but the workplace, complete workplace harmony is not Title VII's goal. The Ninth Circuit made that clear in Peterson. If an employer could exclude anyone who made, say, a co-worker or a customer uncomfortable, Title VII would be completely undone. We know from all of Title VII law that basically customer or co-worker or employee preferences can't justify employment discrimination. We know that from cases like what the Ninth Circuit held in Long Beach. But they can amount to undue hardship. So you're right that they automatically don't qualify, but they certainly can. And that's what the district court found here, that they met the de minimis standard for undue hardship. Well, Your Honor, we would say that you shouldn't be treating religion any differently than you would treat something like race. If a customer preference could determine the employment relationship in the racial context, this court's ruling in Cheney v. Plainfield Healthcare would have been very different. The Fifth Circuit's ruling in Diaz v. Pan American, where it said that an airline couldn't just hire female flight attendants because that's what customers preferred, would have been opposite. And the same should be true of someone's religion. It may be true that students would prefer to have a teacher with different religious beliefs. But if we allow that preference to control, we clearly allow the type of religious discrimination that Congress was trying not to permit with Title VII in requiring religious accommodations to generally applicable and otherwise neutral rules. So are you saying that an emotional impact on students can never qualify as an undue burden if there's a religious accommodation on the other side? No, Your Honor, I'm not saying that. It's clear that there could be undue hardship. Say, for instance, you had a fundamentalist Christian teacher who believed that women's place was in the home, and he refused to call on female students or otherwise treat them equally. That would clearly be an undue hardship. Or say you had a Muslim social studies teacher who refused to talk about the state of Israel or even denied the Holocaust. Those teachers would not be doing their jobs, and that would be undue hardship. But Mr. Klug here never refused to teach anyone. He always did his job. He tried to be respectful and considerate. Do we define it undue hardship by Mr. Klug's job, or do we define undue hardship by the school's mission? Well, Your Honor, the undue hardship analysis is context specific, but there are limits to what a school can do in terms of saying what its mission is. We know this from cases like the Constitution in determining what the mission of the school was, which seems like a pretty sound basis to determine the school's mission. Well, Your Honor, that was only in the most general of senses, in that they need to educate students. But there's no evidence here that students weren't receiving an education. Mr. Klug's classes performed well. There was never any— Well, it was a little bit beyond. It was that they need to educate students. All students have to access to education, and that they need to care for the well-being of their students while they're there. So it was a little bit beyond just educate. Yes, Your Honor, but I don't think the Indiana Constitution says that they need to specifically affirm beliefs. I mean, this case and the holding here will not just apply to Mr. Klug. If you have, for instance, a Jewish social studies teacher who's talking about world religions, and when she's talking about the Prophet Muhammad, she doesn't say, Peace be upon him. That could be highly disrespectful and offensive to a Muslim student, but it doesn't mean that the district could make the Jewish teacher say that. Or say you have a science teacher who's excellent at her job. She just happens to be Jehovah's Witness, and she doesn't say the Pledge of Allegiance every morning with her students in class. It could be that a student from a military family with a strong background there finds that patriotic and offensive. They might even walk out of that classroom, but it doesn't mean that the district can force the teacher to say the pledge. But isn't there more here from the district than just they found it offensive, they didn't like it? What the district court relied on was the emotional harm to the students, which is different than just, I disagree with the practice. I disagree with not saying the pledge. And as the Amici have pointed out, the emotional and psychological harm to transgender students whose identities are basically denied can be quite severe. And the students, as I mentioned before, were aware that denial of their identities was the basis for Kluge's practice. Why would that not be sufficient to establish undue hardship for the district that's charged with providing all students, every student, with an appropriate learning environment? Well, Your Honor, when we're talking about something like emotional harm, we have to ask the question, is it something that rises to the level of being legally significant, or is it subjective offense? Now, I don't think that the Muslim student who's offended by not having the teacher say, peace be upon him, in reference to the Prophet Muhammad, would be any less emotionally offended. I don't think their identity as a Muslim would be any less real. But I don't think that this court would require the teacher to say that. And with respect, I'd like to reserve the rest of my time if I'm allowed. May I ask another question, please, Judge Roper? And we can extend the time if we need to. And I'm going to ask Mr. Borg this question as well. So I think part of the challenge here, Mr. Gray, is that we're trying to apply Title VII in the school context. And the majority of the case law that's out there applies Title VII in the corporate context. So it's a little bit different in terms of the school, and you have to define what the mission is. It's always obvious with a corporation, or almost always obvious. So given that, and given the interest on both sides here, is this question of undue hardship a question of fact? The briefing, and Mr. Borg, I'm going to ask you the same question. The briefing on both sides assumes it can be decided as a matter of law. But is this something that can be decided as a matter of law, or is this a factual question for the jury? Your Honor, I do think it's a question of law. I think what is undue hardship and what is not is a legal question. And I don't think there are any material factual disputes here. What we have is basically Mr. Kluge doing everything in his power to respect everyone, to remain silent and neutral. But wouldn't a factual dispute be you've submitted evidence from teachers that Mr. Kluge was great doing a great job in the classroom, this wasn't having an impact on anybody, and the school has submitted evidence on the other side. Wouldn't that be an issue of fact on the question of undue hardship? Well, I don't think there's any question that transgender students said that they had a subjective impact. Now the subjective impact by the patriotic military family student or the Muslim students would be the same. So the question becomes whether that subjective impact, when the objective use of surnames is not offensive or negative in any respect. In fact, we do it all the time. Not just that those children that said they had, it had an other children. It was bothering parents, it was bothering teachers. Your Honor, the bothering though was based on Mr. Kluge's failure to accept and live in accordance with the orthodox position of the school district on transgenderism. And all his accommodation was was the most modest, minimal thing he could have asked for was to remain silent and neutral and not address that topic. If I'd be allowed to reserve the remainder of my time, I'd appreciate it. You're going to have the whole five minutes that you ask. And I'm sorry, Judge Roper, may I ask one more question, please? And then we'll give him a hundred questions. I want to move just briefly, Mr. Gray, please, to the retaliation claim. I wasn't exactly clear what you were claiming the protected activity is in the retaliation claim. Was it the request for the exemption in the first place or the right to call students by their last name or something else? What is the protected activity that Mr. Kluge is arguing? Yes, Your Honor. I think that there were at least two. One is Mr. Kluge was opposing the district's not granting any religious exemptions, which Title VII requires. And he was saying that the district shouldn't have withdrawn the religious accommodation that he did receive based on complaints. And I don't think there's any doubt that a religious accommodation request and also a policy of granting religious accommodations is protected by Title VII. In fact, Title VII explicitly requires employers to accommodate religious beliefs reasonably without undue hardship. Thank you. Thank you, Judge Roper. Of course. Thank you. Mr. Borg? Thank you, Your Honor. Good morning and may it please the Court. My name is Brent Borg and I represent Brownsburg Community School Corporation. Judge St. Eve, you previewed that you had a question for me, so I'll start right with that one because I understand it. It was what's the spectrum we're dealing with here as far as the standard of review? Isn't the undue hardship issue a question of fact? Is it a question of law? And by extension, did the district court properly grant summary judgment? I think the appropriate analysis for the court to undertake is to start and I think the Seventh Circuit or this court's case law says that is in the abstract. The starting point for the undue hardship analysis is that it is a question of fact. However, that does not rule out by any means that the designated evidence can push the case along that continuum, so to speak, such that it becomes undue hardship as a matter of law. And the district court's conclusion, it's important to note, was two separate and independent bases for undue hardship. Our conversation today has focused on that first basis, the emotional harm to students, the complaints that Brownsburg's administration was receiving, and it is certainly the case that the district court properly concluded as a matter of law that Brownsburg cannot fulfill its educational mission if it is not offering an education to all its students. Implicit in that idea, Your Honor, and this is Brownsburg's mission as well, and you can see it in the record evidence in the FAQs that it was providing to its teachers, was that it wanted to provide a safe and supportive environment. So where do we draw the line there? What's enough to become as a matter of law under de minimis? Here you had two students who specifically identified who spoke out. You had some parents who were unhappy, although they seemed to be more unhappy, arguing that Mr. Klug was not applying the accommodation consistently in the courtroom, which is a separate question. When is it, with these two students and then some teachers saying it, when is it enough as a matter of law or when does it become a question for the jury? Your Honor, I think it becomes a matter of law. In certain circumstances, one student complaint can be sufficient. I think the analysis the court has to undertake in examining that issue is it can't be one student complaining in the abstract. Okay, the first question the court should think about is who is doing the complaining. We're talking about a high school community here, and there's a lot of different stakeholders. There's teachers, there's parents, there's other members of the community who elect the board, and most prominently in this instance, there are students. So the first question is who is doing the complaining? Obviously in this case we've talked about a lot of people were doing the complaining, but to focus on your question where that line is drawn, I think the next point you get to is to what ends are the complaints? And in this instance, the emotional harm when that's coupled with Brownsburg's mission and its priority to provide a safe and supportive student environment, the interest becomes paramount. Brownsburg and an administrator like Principal DeGay cannot look at these complaints that are coming up to him, and again the frequency of them is significant. There's record evidence that the Equality Student Alliance meetings met once a week, and Mr. Klug's use of last names was a regular topic of conversation and complaint. On top of that, Principal DeGay attended monthly meetings with the co-department chairs of Mr. Klug's Performing Arts Department, and they too were telling him that the use or telling Principal DeGay that the use of last names only was impacting that department. But there's also evidence on the other side that Mr. Klug put in that from teachers saying the department was doing great, and they thought the orchestra had become even better. So you've got evidence on both sides about the impact on the quality of education. Certainly. So that comes back to why isn't that a question of fact as opposed to a question of law? Sorry to interrupt. No, thank you, Your Honor. I think it goes back to the question of mission that has been talked about as well. Brownsburg does not get to pick and choose which students who come through its doors it decides to educate. So for Mr. Klug to say he is receiving, he's an DeGay can look at that and say that's not adequate. And I think it bears importance that the continuum of the 2017-2018 school year bears out that Brownsburg administration did not act in haste with this. Does it matter that the accommodation with last names worked for one school year? It does. But I think you need to look at that entire timeline and how that developed and transpired. So the idea was that... Do we know when the complaint started coming in? Was it during that first year? Yes, Your Honor. We're really talking and we're confined to the 2017-2018 school year. So the rough timeline there is that really from day one or the start of the 2017-2018 school year, Mr. Klug has provided two accommodations, the last name only and also relief from the uniform requirement. As we get into the fall semester, the complaints start coming to Principal DeGay, most prominently through Craig Lee, who is a teacher and who is the adult sponsor of the DeGay's declaration. He says, I wanted to give it time. I want to be fair to Mr. Klug. And I think Judge Saini, this is to your point, is that he's not rushing to judgment. He's not drawing a line and saying, John, we can't have this whatsoever. So when the complaints start to reach a critical mass, if you will, and now we're sort of to the end of the fall semester, approximately December 2017, what does Principal DeGay do? He goes to the target of those complaints and he says, hey, here's what's going on. These students are reporting that they feel dehumanized by the use of the only last names. And they're reporting that it's just a terrible experience in their classroom. Does the record reveal how the students became aware of the basis for Mr. Klug's last names practices? And if the students had been unaware of the reasoning behind the accommodation, would that make a difference to the undue hardship analysis here? As to the first part, Your Honor, I don't think the record explicitly states that word got out, so to speak. However, there is record evidence certainly in there from one of the transgender students' declarations that I perceived very much so that this was why Mr. Klug was using only last names. As to the second part, I think the fact that it's open and obvious, again, it adds to part of the student trauma in this case, if you will. And if you go back to one of the transgender students' declarations, he reports that the feeling I was getting is that the only reason we're having this awkward use of last names only is precisely because of me. And that frustrates the classroom. But Mr. Klug did it consistently across the class. He called everybody by their last name. He did. That's correct, Your Honor. But these students also attend other classes. And Mr. Klug was the only teacher at the high school who used only last names. The students, in this instance, I think it's a fair inference that they were able to put two and two together when they go to their other classes and they realize that, hey, these teachers are calling me by my first name as the school requires. If the calling of students by their last name is at odds with the school's mission, is the asking another teacher to hand out school uniforms also at odds with the school's mission? No, not at all, Your Honor. And I think the common thread that runs through both of those is, again, what transpired during the 2017-2018 school year. The situation with the uniform accommodation was that nobody complained about relieving Mr. Klug of that obligation. So you agree that's not an undue hardship? That aspect of the accommodation is not an undue hardship, you agree? Oh, yes, absolutely. I mean, that is a yes, I do. But, again, now we contrast to the last name only. And we have a situation where Principal DeGay is dealing with an abundance of complaints from a variety of stakeholders in the high school community. Your Honor, I have five minutes reserved to the amicus United States of America. If there's anything more you want to say, just this is a very important case, as are all of our cases, of course. I will say briefly to emphasize on the undue hardship question, we did not have time to confront the second basis, but Brownsburg's position is that they are separate and independent bases for granting summary judgment in Brownsburg's favor. With respect to the retaliation claim, the court should affirm the district court on that claim as well. I think there are a variety of hurdles that Mr. Klug cannot clear on appeal. Most prominently that the district court found that he procedurally waived his right to challenge that due to a deficient argument. That is a more deferential standard of review than when we talk about summary judgment in the undue hardship context. I think in the final analysis on the retaliation claim, Mr. Klug has a very high burden of establishing pretext. Namely, can he rebut that Brownsburg and specifically its administration did not honestly believe that it was withdrawing the accommodation because of all the complaints that we've been talking about today? Submit that there is no evidence to rebut that point, and that is further basis to affirm the district court on the retaliation claim. And we would request that this court affirm the district court in all respects. Thank you very much, Mr. Borg. Good morning, Mr. Lee. And Mr. Lee, why don't you tell us your name? And then I have questions. May it please the court, Jason Lee for the United States. This court should affirm that I have a addressed the issue of the sincerity of Mr. Klug's religious belief. It appears that Mr. Klug was inconsistent in his application of the last name policy. Is the district court correct that if we were to remand, there is a genuine issue of material fact regarding the sincerity of his religious belief? It was curious to me that on the one occasion that he decided he would follow the district's policy and use the power school names, it was at a larger, more public awards event rather than a classroom setting. Your Honor, the United States doesn't dispute the sincerity of Mr. Klug's religious beliefs and takes no position on the sincerity. I do take Your Honor's point regarding his use of transgender students' first names in that one instance. He does justify it based on his belief that he needed to proceed as a sports coach did. I would only point out that if a sports coach was informed that his way of addressing students was causing them to feel alienated and make his players feel dehumanized, presumably a reasonable sports coach would have abandoned the practice. I think the stronger basis for affirmance of the district court's ruling here is the harm that's clear and uncontested in the record as Judge St. Eve noted. That evidence of harm is at an individualized basis up to the institutional basis. We have clear evidence of harm to these two students, these two transgender students, Aiden and Sam. They were harmed personally by Klug's unwillingness to recognize a core part of their identity. They were harmed educationally because they felt excluded from classroom activities and felt anxiety interacting with the teacher. They were harmed socially because they were alienated and subjected to public scrutiny among their peers. But even beyond these students, the evidence shows that all of the students in Klug's classes felt uncomfortable. That's separate appendix 69. They were all made to feel uncomfortable as a result of the accommodation. Even zooming out beyond that, the heads of the performing arts department described adverse impacts on the functioning of the performing arts department itself. And as the district court noted at footnote 11, the accommodation actively interfered. That's how the district court discussed it, actively interfered with the school's efforts to create a safe and welcoming learning environment for all students. It simply cannot be the case that Title VII would require such an accommodation to be provided where these harms were occurring. And as Judge St. Eve, as you noted, this evidence is uncontroverted. Klug points to no evidence suggesting that these harms weren't the cause of these reactions. His sole response then is to characterize this as mere grumbling. But that is simply a mischaracterization of case law and the record. The court need look no further than the Casey cites from the Sixth Circuit, Cummins, which discussed grumbling. But as the Sixth Circuit noted in Cummins, the reports of complaints from co-workers was mild and infrequent. That is policy of the school to require teachers to use the name in power school is entirely reasonable for pedagogical and practical reasons. Let me give you an example. All the policy requires teachers to do is to use in the classroom the same name that also appears on students' report cards, on their transcripts, on their permanent record. For example, imagine a transgender student asks Klug to write a letter of recommendation. All this policy requires is that the name used on that letter of recommendation sent to a college for application purposes, that letter will have the same name as also will be used on the transcript that is also sent to admissions officials. Mr. Lee, what's your position on whether or not this is a question of fact, or if it's something the court can decide as a matter of law? And this being the undue hardship issue. I think the proper analysis that Klug has failed to show any genuine dispute of material fact as to whether or not the school has satisfied its burden of showing undue hardship. I think that showing of undue hardship is uncontested and undisputed in the record. The one other point that I should mention is Klug's counsel. Oh, I see I've run out of time. Can I make one? Yeah, sure. The one additional thing I wanted to add is Klug's counsel has suggested a couple of hypotheticals suggesting other instances in which a teacher's conduct might cause some discomfort to students. It's not our position that any discomfort to students or any harm to students will always show undue hardship. But at least in the hypotheticals he raises, it's hard to see under Title VII how there's any, and this is from the language of the statute, there's any undue hardship on the conduct of the employer's business. That's the standard for showing undue hardship, and it's evident in the record here. And unless there's any other questions from the panel that I could help answer, the United States respectfully requests that this court affirm the district court's ruling. Thank you very much, Mr. Lee. Mr. Gray, five minutes for Mr. Gray. Thank you, Your Honor. I just want to point out that I think the hypotheticals I raised, the interest of the school is exactly the same. It's in affirming the student's identity. Now, for some people, it's their sexual orientation. For some people, it's their faith. So a Muslim student or a patriotic student may find their identity in those things just as strongly as a transgender student finds it in their sexual identity. Isn't it protecting their emotional well-being, though? That's what the district court found. That's what the school has consistently said, that they have to stop this accommodation because of the impact on the emotional well-being of students while in its classroom, and that's part of its mission. Well, Your Honor, I don't know how a school district could make sure that no student in a school, in a public school, where there's lots of different beliefs and people from different backgrounds, never have any emotional discomfort. If that were true, Zemechnik, a decision from this court, would have come out differently. But this was more than discomfort. The evidence that was before the district court suggested real emotional harm, emotional distress. I think one student ultimately left the school because of it. Well, Your Honor, the student left the school after Mr. Kluge was forced to resign, so it couldn't have possibly been based on his religious accommodation. And the evidence could have been all of the problems that the child was having came from before Mr. Kluge left the school. Well, if the problems were caused by Mr. Kluge, Your Honor, they should have been resolved when Mr. Kluge was forced to resign. But the actual leaving orchestra and leaving the school happened after the school district forced Mr. Kluge to resign. I think it's important that this court doesn't create a circuit conflict. We know that it can't be, undue hardship can't be anything that someone finds irritating or unwelcome. If this court holds that school districts are basically able to make sure that students don't encounter anything they find irritating or unwelcome, that will create a circuit conflict. There were no protests at this school. There were no significant disruptions. They were discussions and some feeling of unhappiness and perhaps of offense. But in public schools, people encounter different ideas. That's part of the educational process. And that's part of what Zemechnik was getting at. In terms of the educational mission, Your Honors, there has to be some limits. As the Supreme Court from Justice DeLeo and Justice Kennedy said in Morris v. Frederick, school districts can say that anything is part of their educational mission. It can't be that they can fire any teacher who has a different view. In this case, a teacher is just trying to remain neutral and silent. He's not trying to proselytize his beliefs. But you're not arguing. If a teacher had a religious belief that there's no such thing as attention deficit disorder, but that children with ADD were simply sinful in their behavior, could that teacher discipline ADD children for their inattention or refuse to provide ADD accommodations to those children? No, Your Honor. I think that would be undue hardship. But here, Mr. Kluge wasn't denying his students anything. They had an education. He taught them and he taught them well. And I think you have to keep in mind that this is an orchestra. So there are very few than doing it by section, which is a class of about 40 students. There's very few instances in which an individual student's name would even come up. Mr. Gray, you're not challenging that the emotional well-being of students at school is part of a school's mission, are you? I'm not saying that the school shouldn't care about its students' emotional well-being. Certainly it should. And it should provide counseling services to students who are having emotional distress. But that doesn't mean that any teacher... Even when the emotional distress is being caused by the teacher? Well, Your Honor, I think any student could say that you're not saying something that affirms me is offensive. I mean, I can't imagine what teacher would be safe under that standard. We don't have a standard in which students are expecting to be universally affirmed. I don't see how that's possible. If you have a transgender student on one side, a Christian student on the other, who believes absolutely diametrically opposed things, how is the district going to be able to affirm both of them? The answer is that it can't. And I see I'm out of time, Your Honors. I just respectfully request that this court join the Sixth and Ninth Circuits, reverse the district court's grant of summary judgment, and remand for summary judgment to be entered in favor. Mr. Klug, thank you. Thank you to Mr. Gray, Mr. Bork, and Mr. Lee. And the case will be taken under advisement. Thank you.